## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## SPARTANBURG DIVISION

GABRIEL OLIVIER,

      Plaintiff,

vs.

CITY OF SPARTANBURG, SOUTH CAROLINA; STEPHEN MCCLURE, individually and in his official capacity as police officer with Spartanburg Police Department,

      Defendants.

Civil Action No: 7:24-cv-946-TMC

**VERIFIED COMPLAINT**

Comes now Plaintiff Gabriel Olivier and avers the following:

## INTRODUCTION

1.      This is a civil rights action brought by Gabriel Olivier ("Olivier") against City of Spartanburg, South Carolina ("Spartanburg") and Lieutenant Stephen McClure ("Lt. McClure") challenging the constitutionality of Spartanburg Code of Ordinances § 30-12 "Picketing or patrolling" on its face and as applied to Olivier's religious speech.

2.      Section 30-12 classifies Olivier's religious evangelistic speech as "picketing" in requiring him to obtain a permit to engage in this type of speech and barring him from using amplification.

3.      Pursuant to 42 U.S.C. §§ 1983 and 1988, Olivier seeks injunctive and declaratory relief against Spartanburg to avoid further violation of his constitutional rights.

4.      Defendants promulgated, invoked, construed, and applied § 30-12 to Olivier's religious speech to deprive him of his constitutional rights.

5.      Each and every act specified herein was committed by Defendants under the color of state law and authority.

## JURISDICTION AND VENUE

6.      This cause of action raises federal questions under the United States Constitution and 42 U.S.C. § 1983.

7.      The Court has jurisdiction over Olivier's claims for injunctive relief under 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over Olivier's request for declaratory relief under 28 U.S.C. §§ 2201 and 2202. And the Court has jurisdiction over Olivier's claims for costs and attorney fees under 42 U.S.C. § 1988.

8.      Venue is proper in the District of South Carolina per 28 U.S.C. § 1391(b).  The defendants reside in this district and the claims arise in this district.

## PLAINTIFF

9.      Plaintiff Olivier is a resident of Bolton, Mississippi.

## DEFENDANTS

10.     Defendant Spartanburg is a municipal governmental authority and a subdivision of the State of South Carolina, having the capacity to enact and enforce laws and ordinances regulating activities occurring on City streets, sidewalks, and ways.

11.     Defendant Lt. McClure is a lieutenant with the Spartanburg Police Department.  In his official capacity, Lt. McClure is responsible for enforcing applicable laws and ordinances.  Lt. McClure is sued individually and in his official capacity.

## STATEMENT OF FACTS

### *Olivier's Desire to Share his Religious Beliefs*

12.    Olivier is an evangelical Christian who wants to share the gospel (good news) of Jesus Christ with others.

13.    He imparts a religious, evangelistic message that everyone sins and deserves eternal damnation but Jesus Christ grants salvation to those who repent of their sins and believe and trust in him.

14.    In explaining the need for Jesus as a savior, Olivier specifies certain behaviors like homosexuality as sin, but he does not picket or protest sins, or the events or individuals involved in what he believes is sinful activity.

15.    With his religious messaging, Olivier does not try to bring attention to an issue or effectuate political change.  The sole purpose for his speech is to evangelize and bring people to a saving faith in Jesus Christ.

16.    Olivier evangelizes in public areas with significant pedestrian traffic where he can reach as many people as possible with his message.

17.    When sharing his faith, Olivier is often accompanied by a few friends.

18.    To deliver his message, Olivier primarily gives speeches about his Christian beliefs, which he refers to as preaching.

19.    When he speaks, Olivier often uses a hand-held amplification device so he does not have to yell to be heard.  He prefers to address individuals in a conversational tone.

20.    For Olivier, an amplification device is an essential aid for communicating his evangelistic message.

21.    Olivier also likes to use signs to express his Christian faith.

22.     Among other public places, Olivier wants to share an evangelistic message on public ways in downtown Spartanburg during the Upstate Pride SC March & Festival (or "Pride Fest"), and, particularly, to the attendees of that event.

### *Spartanburg Code of Ordinance § 30-12*

23.     Spartanburg maintains city ordinance § 30-12 entitled "Picketing or patrolling."

24.     Section 30-12 reads:

(a)     *Conduct of picketing; penalty.* For purposes of this section, the term "picketing" means an organized effort to express publicly a point of view at a given place with signs, oral statements, or the like in a systematic manner, which involves walking or standing in the same area for a prolonged period of time. Peaceful picketing in the furtherance of a lawful purpose shall be allowed in the city, provided the picketing is done under the following conditions:

    (1)     Picketing may be conducted only on the sidewalks, on the grounds of a city-controlled park or plaza, or in other city-owned areas or rights-of-way normally used or reserved for pedestrian movement, and may not be conducted on the portion of a street used primarily for vehicular traffic.

    (2)     Such picketers must have applied for and been issued a permit as required under subsection (b) of this section.

    (3)     Such picketers may carry written or printed signs (which such term shall be interpreted to include flags), provided the signs do not interfere with the free use of the sidewalk or rights-of-way by other pedestrians. Such signs, with reasonable use, shall be deemed to comply if they are composed of paper, cardboard, poster board, cloth, vinyl, or similarly non-rigid material; do not exceed 1/32 inch in thickness; do not exceed 20 inches by 30 inches or 600 square inches in the case of signs composed of paper, cardboard, poster board, or similar material; and do not exceed four feet by six feet in the case of signs composed of cloth, vinyl, or a similar material. Signs exceeding these dimensions are presumed threats to safety.

    (4)     Such picketers on sidewalks or on rights-of-way normally used or reserved for pedestrian movement must march or stand single file and not congregate so as to block any sidewalk, driveway, or business entrance. All laws pertaining to the orderly flow of pedestrians must be obeyed.

(5)    For public safety reasons, the following are prohibited in the immediate proximity of pickets, and due notice shall be included in every picketing permit that these restrictions apply:

    a.    Open flames and combustible solids;

    b.    Sticks, poles, selfie sticks, or other similar elongated solid objects capable of inflicting bodily harm as a striking or stabbing object, excluding commercially available corrugated cardboard tubing as the supporting article for signs, flags, and the like;

    c.    Backpacks, satchels, bags, coolers, or similar personally carried containers exceeding six inches by eight inches by three inches, except when said container is completely clear and see through;

    d.    Pursuant to S.C. Code 1976, § 23-31-520 the open carry of any firearm or ammunition except as permitted by the South Carolina Code of Laws;

    e.    Any mechanical or handmade contrivance that launches any projectile of solid, liquid, or gaseous composition, including aerosols/pressurized canisters;

    f.    Any stabbing, cutting, slicing, or striking blade, whether of metal or other solid composition;

    g.    Any striking object, such as a bat, stick, brass knuckles, martial arts weapons, implement handles and the like, which would inflict bodily injury;

    h.    Any facial mask, headgear, or cloth worn over any portion of the face which prevents facial identification of a person;

    i.    Any carried object that resembles or serves the purpose of a shield;

    j.    Any armor or defensive covering that resembles or serves the purpose of defensive body armor;

    k.    Carried signage exceeding the size restrictions set forth in subsection (a)(3) of this section;

    l.    Bicycles, automobiles, and mopeds; and

    m.    Any device, electronic or mechanical, used to amplify sound.

        This subsection shall not apply to law enforcement officers while in the discharge of their duties.

(6)    The organizer of a picket, or the person designated in the permit as the one who will carry the permit, shall be responsible for posting conspicuous signage at the picketing location informing participants that the open carry of firearms is prohibited for the duration of the picket.

(7)    Picketing done contrary to this section shall be unlawful. Police or city personnel may confiscate any of the items listed in subsection (5) above if a picket participant refuses to remove the prohibited item from the picketing site, with the exception of firearms in accordance with S.C. Code 1976, § 23-31-520. A firearm or ammunition may be seized or confiscated pursuant to lawful arrest.

(b)    *Picketing permit.*

(1)    A picketing permit application to picket must be submitted to the city manager or his designee in a form approved by the city manager and in accordance with the time limits and guidelines established in table 30-12.1 set forth in subsection (f) of this section. The city manager shall make the application form available online, and at multiple locations throughout the city, including city hall and the police department. The application shall include the following information:

a. The name, address, and contact telephone number of the organizer of the picket;

b. The name, address, and contact telephone number of the person who will carry the permit if different from the organizer;

c. The location where the picket is to take place;

d. The date and time the picket will begin and end; and

e. The anticipated number of participants and the basis on which this estimate is made.

(2)    Upon application in accordance with subsection (b)(1) of this section, the city manager or his designee shall immediately issue a permit. If application is submitted for the same date, time, and location for which a permit has already been issued, the permit shall be issued for a location as close as reasonably possible to the location set forth in the application. The permit shall contain all information stated in the application. The organizer of a picket, or the person designated in the application as the one who will carry the permit, shall be responsible for maintaining the permit and shall present it when so requested by a law enforcement officer or other city official.

(3)    Spontaneous pickets which are occasioned by news or affairs coming into public knowledge less than 48 hours prior to such picket may be conducted on the sidewalk in front of city hall without the organizer first having to apply for a permit under this subsection. In the event the sidewalk area cannot safely accommodate the number of persons assembled, a shift commander or supervisor of the police department of the city shall direct the picketers to a suitable alternate location.

(c)    *Interference with pickets.* It shall be unlawful for any person to interfere physically with such pickets in the use of the sidewalk or address profane,

6

indecent, abusive or threatening language to or at such pickets or others to breach the peace.

(d) *Crowd dispersal.* A shift commander or supervisor of the police department may, in the event of the assemblage of persons in such numbers as to tend to intimidate picketers pursuing their lawful objective through numbers alone or through use of inflammatory words or threatening gestures that are ordinarily used to intimidate people, direct the dispersal of persons so assembled, and any police officer may arrest any person who fails to leave the place of assemblage when so directed by the police.

(e) *Restrictions.* Persons engaging in picketing activity cannot do so inside an area designated as an event area for which a permit has been granted to another individual or group under this chapter, if the picketing behavior has the effect of interfering with, hampering, hindering, or getting in the way of those participating in the permitted event in accordance with its purposes or with the general public making use of the space for its ordinary and customary purposes. Whenever any police officer or municipal employee charged with monitoring or supervising event activity determines the picketing behavior is interfering with, hampering, hindering, or getting the way of others as provided in this section, then the officer or employee may direct the picketers to relocate to other public space in reasonable proximity where such conduct can continue, if lawful, so long as the picketing does not interfere with, hamper, hinder, or get in the way of persons participating in the event for its intended purposes or of members of the general public making use of the public space for its ordinary and customary purposes.

(f) *Picketing table.* An organizer of a picket that the organizer knows or should reasonably know will be by a group of a size set forth in the table shall give at least the corresponding minimum advance notice of intent to picket set forth in the table to the city manager or his designee.

Table 30-12.1 Picketing Table

| *Group Size* | *Minimum Advance Notice Required* |
|---|---|
| 1—10 | 24 hours |
| 10—50 | 48 hours |
| 51—100 | 72 hours |
| 101—200 | 96 hours |
| 201—400 | 5 calendar days |
| Greater than 400 | 7 calendar days |

(Code 1988, § 16-12; Ord. of 11-10-2008; Ord. of 10-28-2019; Ord. of 9-27-2021)

**Olivier Attempts to Evangelize at 2023 Upstate Pride SC March & Festival**

7

25.      On Saturday, October 28, 2023, around 11:00 a.m., Olivier went to downtown Spartanburg for the Upstate Pride SC March & Festival.

26.      Olivier did not seek to obtain a permit under § 30-12 and was unaware of a need for a permit.  He did not plan to picket at the event or object to the event.  He wanted to evangelize and share his Christian faith.

27.      The Upstate Pride SC March & Festival was open to the general public on this day with no requirement for payment or ticket to obtain entry into it.  The festival lasted from 11:00 a.m. to 4:00 p.m.

28.      For the Pride Fest event, a portion of W. Broad St. was closed to vehicular traffic between S. Daniel Morgan and S. Church St, as was a portion of S. Spring Street between E. Main St. and W. Kennedy St.

29.      Various vendors and a beer tent were located on W. Broad St.  An entertainment stage was set up on the south side of the intersection of W. Broad St. and S. Spring St.

30.      After parking his vehicle, Olivier walked around inside the boundaries of the event, predominantly on W. Broad St., observing the different booths.

31.      After walking around for a while, Olivier noticed that some attendees were marching down W. Broad St.  He stopped and began to preach an evangelistic message to them as they walked by, without amplification, encouraging them to repent of their sin and believe in the gospel of Jesus Christ.

32.      Not long after he began, Spartanburg police officer Cortes approached Olivier and told him to stop chanting.

33.      Olivier advised that he was preaching, not chanting.

34.     Officer Cortes clarified to Olivier that he must speak conversationally to speak to others.

35.     Olivier asked the police officer if her order was based on an ordinance, and she responded that it was, identifying § 30-12.

36.     Olivier was disappointed but decided to walk around and speak with people in a conversational tone.  And Officer Cortes followed him.

37.     After a few brief exchanges, Officer Cortes called someone on her radio.  She then addressed Olivier again.  The officer confirmed to Olivier that the area was public and that he had a right to be there and speak, but she warned him to refrain from saying anything "negative or derogatory" to attendees.

38.     Olivier was troubled by the warning and the police officer following him around. Realizing many people find the gospel, and especially the need for forgiveness of sins, negative and derogatory, he was unsure of what he could say without getting into trouble.

39.     A person with a booth addressed him about HIV testing.  This led to a discussion with this person and others at the booth about condoms and AIDs.  Olivier tried to carry on a conversation but was uncertain about how he could respond without violating the officer's order.

40.     Fearful of arrest, Olivier left the booth and Officer Cortes persisted in following him.

41.     Oliver continued to walk around on W. Broad Street but he remained unsure of what he could say to anyone.

42.     Concerned about how Officer Cortes might react if someone did not react well to his gospel message, Olivier decided to walk outside the boundaries of the event to avoid further difficulty.

43.     Officer Cortes accompanied Olivier until he walked outside the event.

44.     After exiting the event, Olivier picked back up with his preaching for less than a minute. He then traversed over to the northern most part of the boundary, as marked off by several traffic barriers, at the intersection of S. Spring St. and E. Main St. and met up with a few friends.

45.     Olivier stood at that location on the side of the traffic barriers outside the event. From this spot, he was at least one block away from a vast majority of attendees of the Pride Fest who were mingling about on W. Broad St.

46.     Olivier did not hold a sign at that location. He decided to share his evangelistic message orally from this spot because he did not believe many people would be able to read his sign or look in his direction.

47.     Due to the distance between Olivier and W. Broad Street where a vast majority of attendees were located, he needed amplification for attendees to hear his message while speaking conversationally.

48.     Olivier began speaking with the aid of an amplifier in a conversational way.

49.     Soon, some unknown individual came within 20 to 30 feet of Olivier and began blowing an air horn toward Olivier in an effort to drown out Olivier's message.

50.     Not long after the air horn started, an unidentified female police officer walked up to Olivier. He hoped the officer would ask the person using an air horn to cease, but she walked by that person and focused her attention on Olivier instead.

51.    The unidentified officer informed Olivier that he could not use an amplifier, indicating his use of an amplifier violated a Spartanburg ordinance.

52.    Elaborating further, the police officer told Olivier that he was not allowed to use an amplifier device in the city limits, warning: "You need to go."

53.    Olivier did not understand the instruction.  He had used amplification in other municipalities without issue and was unaware of any law in Spartanburg criminalizing the use of an amplifier.  He knew he was not picketing.  Olivier asked the officer to identify the ordinance she was using as a basis for her directive.

54.    The officer ignored the question and reiterated to Oliver that he needed to go.

55.    Olivier reiterated his request to the police officer to identify the ordinance precluding his amplified speech.  The officer repeated to him that he had to move.

56.    Olivier pointed out to the officer that he was already standing outside the parameters of the event.  Nonplussed, the officer told Oliver again that he could not use the amplifier.

57.    The officer then called someone on her two-way radio, telling that person, "He's not listening," and provided their location.

58.    Several other police officers, including Officer Cortes and Officer Dahlberg, soon came to the scene and joined the conversation.

59.    Oliver overheard one police officer say he was not breaking the law.  In light of the inconsistencies in the communications, and desiring to proceed with message, Olivier decided to continue with his amplified speech until a supervising officer arrived.

11

60.     As before, Olivier spoke in a conversational manner, addressing attendees who could hear him.

61.     Almost as soon Olivier started his speech the individual with the air horn started up too.  None of the police officers acknowledged the loudness of the air horn or its effect on Olivier's speech.

62.     Less than one minute later, Lt. McClure with the Spartanburg Police Department abruptly confronted Olivier, grabbed his amplifier, told him he was breaking the law, and demanded Olivier produce his identification.

63.     The lieutenant added that he was taking the amplifier because Olivier could not have it, the amplifier would go into evidence.

64.     Olivier did not understand what was happening.  He tried to tell the lieutenant that he was not breaking the law.

65.     Lt. McClure cut Olivier off and told him that he was under arrest "right now" and warned Olivier to not resist arrest.

66.     Olivier had no intention of resisting but was surprised to learn he was arrested or could get arrested for what he was doing.  He was unaware of any law he was violating.  He asked the officer what law he was breaking.

67.     Lt. McClure responded that Olivier was violating the permit picketing ordinance for using amplified sound.

68.     Olivier reminded the lieutenant that he was positioned outside the permitted area of the event, but Lt. McClure retorted that it "doesn't matter" because Olivier did not have a permit to conduct his activity.

69.     Lt. McClure added that he would speak with his supervisor about whether he needed to order Olivier to disburse the area altogether or let him stay.

70.     Olivier inquired about the citation. The lieutenant informed they were about to get to the point where Olivier would get arrested instead of receiving a citation.

71.     Oliver asked why, and the lieutenant claimed Olivier was disrupting a picketed event.

72.     The officer reiterated to Olivier that he was in violation of City ordinance requiring a permit for picketing.

73.     Olivier was puzzled by the officer's characterization of his activity. He asked Lt. McClure how he was picketing. Instead of answering, Lt. McClure said Olivier was picketing and protesting.

74.     Disputing he was picketing or protesting, Olivier pointed out that he was standing on a crosswalk outside of the permitted area.

75.     Lt. McClure informed Olivier that he was going to walk back to his vehicle to write up a citation for Olivier.

76.     The lieutenant warned Olivier that he would arrest him if he continued to have "problems" with him after he came back. He asked: "Are we good on that?"

77.     Unsure of what the police officer meant, Olivier asked what problems he was referring. Lt. McClure said problems are whatever he determines.

78.      Olivier voiced concerns about a police officer deciding whether he was causing problems without guidance. Lt. McClure told Olivier to review the ordinance and walked away.

79.      Olivier was perplexed by the bar on amplification.  While he was waiting for Lt. McClure to come back, he heard amplification in the area from various sources. Amplified sound was coming from W. Broad St. and a nearby park.  Additionally, Olivier heard a radio station using an amplifier as they broadcasted a live show.

80.      Officers Cortes and Dahlberg remained with Olivier to keep him detained.

81.      Oliver queried Officer Cortes about the meaning of picketing and she advised him the meaning is found in the ordinance.

82.      Several minutes later, the lieutenant came back, gave Olivier his identification and issued Olivier a citation, informing him that he was charged for violating the picketing permit ordinance involving the use of amplified sound under § 30-12.

83.      Lt. McClure also informed Olivier of his hearing date and that the court appearance is mandatory because it was a criminal violation.

84.      The lieutenant also showed Olivier a piece of paper containing a portion of § 30-12, and specifically, paragraph (d) relating to the crowd dispersal rule.

85.      Lt. McClure advised that he printed out the crowd dispersal rule because it related to his reference to "problems" that he had discussed with Olivier previously.  He added that, under this rule, the shift commander, which he was, could order Olivier to go to another place of his choosing and should Olivier refuse to leave, he would be subject to arrest.

86.      The lieutenant then handed the copy of the crowd dispersal rule to Olivier, saying he wanted to make sure Olivier had a copy of it.

87.      Confused, Olivier asked the lieutenant how the rule would work and where he would be required to go.

88.     Lt. McClure told Olivier he would have to go wherever he decides.  Elaborating, the lieutenant advised that if Olivier created problems, he would direct him to another public space, and if Olivier refused to relocate, he could be subject to arrest.  The lieutenant added: "It's in the ordinance, you can read it."

89.     Olivier asked if he could stand there and read the bible without amplification, whether that type of speech would cause problems, and the lieutenant indicated he was free to conduct this activity.

90.     A friend of Olivier's then asked Lt. McClure whether a plastic cone would be a problem and the lieutenant responded in the affirmative, informing the City considers a plastic cone to be amplification.

91.     Olivier objected to this depiction of a plastic cone because a plastic cone directs speech, it does not amplify noise level, but the officer did not budge, reasoning that any electronic or mechanical device classifies as amplification.  He warned Olivier that he would issue a citation for anyone using a plastic cone.

92.     After issuing the citation and warning, Lt. McClure left the area along with the other police officers.

93.     Olivier began reading his bible bare throat, but not for very long. He was forced to yell and could not communicate his message effectively without an amplifier.

94.     Olivier was also unsure whether he could cause "problems" and trigger the crowd dispersal rule with his speech.

95.     Effectively deprived of oral speech, Olivier decided to use a sign instead.

96.      Recalling the futility of using a sign outside the event, Olivier was inclined to hold a sign with the confines of Pride Fest.  But wanting to avoid arrest or citation, Olivier determined to stay silent while doing so.

97.      He and a friend grabbed a couple of hand-held signs, both with messaging encouraging salvation through Jesus Christ, and held up those signs while standing on a sidewalk at the corner of S. Spring Street and W. Broad Street.

98.      They did not block pedestrian traffic.  Few people were walking in the area at that time.

99.      Also, neither Olivier nor his friend said anything to anyone.  They both remained silent, standing in that location, holding their signs.

100.      Olivier presumed this activity did not violate the law.  However, a police officer walked up and advised Olivier that they could not have signs.  Several other policer officers soon join the other officer, including Lt. McClure, and backed up the directive.

101.      Lt. McClure confirmed to Olivier that he had to put the sign away for violating picketing permit ordinance.

102.      Not having the ability to either speak or hold a sign, Olivier stopped sharing his message and left the event.

103.      On his scheduled court date, Olivier appeared and pled no contest to the charge for violating § 30-12.  The municipal judge issued a fine, which Olivier promptly paid.

***Section 30-12 Continues to Stymie Olivier's Speech***

104.    The Upstate Pride SC March & Festival is an annual event. Olivier wants to come back and share his gospel message at the 2024 event as well as future Pride Fest events. He also wants to come to Spartanburg to share the gospel in public places at other times.

105.    Section 30-12 persists in restricting Olivier's religious expression on city-owned ways, restricting any form of expression and banning amplification.

106.    The ordinance requires Olivier to obtain a permit and provide 24-hour advance notice for any individual or small group expressive activity involving him expressing a point of view, including holding a sign.

107.    The ordinance further bans amplification altogether if Olivier seeks to use this aid to share his gospel message. The prohibition also includes plastic cones.

108.    Moreover, Olivier is deterred from sharing his beliefs for fear of Spartanburg applying the crowd dispersal rule in § 30-12(d).

109.    Olivier's fear of criminal arrest and other sanctions deters his constitutionally protected expression on public ways in Spartanburg.

110.    The adverse impact of chilling and deterring Olivier from exercising his constitutional rights on public ways constitutes irreparable harm to him.

111.    Olivier has no adequate remedy at law for the loss of his constitutional rights.

## FIRST CAUSE OF ACTION

### *Violation of Free Speech Clause*

112.    Olivier's religious expression constitutes protected speech under the First Amendment.

113.    Section 30-12 and Spartanburg's application of it:

17

    a.     enforces overly broad restrictions on protected speech;

    b.     singles out a select type of speech for discriminatory restriction;

    c.    chills the free speech and free exercise of religious expression of Olivier as well as that of third-party citizens;

    d.    restricts speech on basis of content and viewpoint;

    e.    creates an invalid heckler's veto: and

    f.    lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression.

114.    Defendants cannot justify their undue restriction on the points of view Olivier seeks to communicate on public streets, sidewalks, and ways.

115.    Defendants cannot justify enforcement of § 30-12 to eliminate amplified speech in traditional public fora.

116.    Defendants cannot justify enforcement of § 30-12 to require a permit for single and small group expression in traditional public fora.

117.    Section 30-12 violates the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

    WHEREFORE, Olivier respectfully prays the Court grant the equitable and legal relief set forth in his prayer for relief.

## SECOND CAUSE OF ACTION

### *Violation of Due Process Clause*

118.    Section 30-12 contains vague language and lacks objective standards for guiding police officers with enforcement.

119.     The vague language allows Defendants to enforce § 30-12 in an *ad hoc*, arbitrary, and discriminatory manner.

120.     Defendants cannot justify the unduly vague language of the ordinance.

121.     Section 30-12 is void for vagueness and violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Olivier respectfully prays the Court grant the equitable and legal relief set forth hereinafter in his prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Olivier respectfully prays for relief in that this Court:

A.     Assume jurisdiction over this action;

B.     Enter a judgment and decree declaring § 30-12 is unconstitutional on its face and as applied to Olivier's religious speech, violating Olivier's rights and those of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

C.     Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying § 30-12 to Olivier's religious expression on public streets, sidewalks, and ways in Spartanburg to ban his amplified speech or speech involving plastic cone;

D.     Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying § 30-12 to Olivier's religious expression on public streets, sidewalks, and ways to require a permit and 24-hour advance notice for individual and small group speech;

19

E.      Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying § 30-12(d) crowd dispersal rule to Olivier's speech when he is not attempting to disrupt a picket;

F.      Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

G.      That this Court award Olivier his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

H.      Grant such other and further relief as appears to this Court to be equitable and just.

Respectfully submitted,


                              *s/ Henry P. Wall*
                              Henry P. Wall, Fed. ID # 4891
                              Bruner, Powell, Wall & Mullins, LLC
                              1735 St. Julian Place, Suite 200
                              Columbia, SC 29204
                              Phone: (803) 252-7693
                              hwall@brunerpowell.com
                              *Attorney for Plaintiff Gabriel Olivier*


February 23, 2024

## **VERIFICATION OF COMPLAINT**

I, Gabriel Olivier, a citizen of the United States and a resident of Bolton, Mississippi, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

_____
GABRIEL OLIVIER

## <u>VERIFICATION OF COMPLAINT</u>

I, Gabriel Olivier, a citizen of the United States and a resident of Bolton, Mississippi, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

GABRIEL OLIVIER